**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**WINSTON-SALEM DIVISION**

| | |
|---|---|
| Kevin Curry and Christine Curry, *on behalf of themselves and all others similarly situated*, | Case No. |
| Plaintiffs, | |
| v. | **COMPLAINT – CLASS ACTION** |
| Novant Health, Inc., | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiffs Kevin and Christine Curry ("Plaintiffs") bring this Class Action Complaint against Novant Health, Inc. ("Defendant"), in their individual capacities and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions, their counsels' investigation, and upon information and belief as to all other matters, as follows:

1.      Plaintiffs bring this class action against Defendant for its willful disclosure of its patients' personally identifiable information ("PII") and personal health information ("PHI")[1] including, but not limited to, demographic information such as email address, phone number, computer IP address, and contact information entered into Emergency Contacts or Advanced Care Planning; and information such as appointment type and date, physician selected, button/menu selections, and/or content typed into free text boxes. [2] Novant further admits that patients' Social

---

[1] This information is collectively referred to as "PII and PHI" or "Private Information."
[2] https://www.novanthealth.org/home/about-us/newsroom/press-releases/newsid33987/2672/novant-health-notifies-patients-of-potential-data-privacy-incident-.aspx (last visited August 21, 2022).

1

Security numbers and financial information may also have been transmitted to a third party, Facebook,[3] without the necessary notice to and consent of its patients.

2.  Defendant is a three-state integrated network of physician clinics, outpatient centers and hospitals. Its network consists of more than 1,800 physicians and 35,000 employees at more than 800 locations, including 15 medical centers and hundreds of outpatient facilities and physician clinics. [4]

3.  Headquartered in Winston-Salem, North Carolina, Novant Health claims that it is committed to making healthcare remarkable for patients and communities, serving more than 5 million patients annually.

4.  In May 2020, Defendant engaged in a campaign to encourage its patients to use its digital healthcare platform and tools such as the MyChart patient portal, which allows patients to schedule and attend doctors' appointments, renew their prescriptions, view test results, and access virtual care options.[5] Defendant's campaign involved the use of Facebook advertisements and Facebook's tracking pixels to monitor how patients interacted with Novant's website and patient care portal ("Facebook Pixel"). The Facebook Pixel is a piece of code that "tracks the people and type of actions they take."[6]  When a user accesses a website hosting the Facebook Pixel, Facebook's software script surreptitiously directs the user's browser to simultaneously send a separate message to Facebook's servers. The information sent to Facebook by Novant includes which pages the patient visits, which buttons are clicked, the specific information users enter into

---

[3] Facebook's parent Company is Meta and Facebook and Meta are collectively referred to herein as "Facebook."
[4] https://www.novanthealth.org/Portals/92/novant_health/documents/media/2022_Media_kits/2022_Novant%20Health%20Fact%20Sheet_final.pdf (last visited: August 21, 2022).
[5] MyChart | Novant Health
[6] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

forms (e.g., name, home address, phone number, email address), search queries (e.g., "do I have covid"), and other information including a patient's IP address.[7]

5.    Though Defendant willfully and intentionally incorporated this code into its website at least as early as May of 2020, Defendant did not disclose to Plaintiffs Class Members that it shared their sensitive and confidential communications via the website with Facebook until August 12, 2022. [8]

6.    Defendant encouraged Plaintiffs and Class Members to use its digital tools via its website to receive healthcare services and Plaintiffs and Class Members did so with the reasonable understanding that Defendant would maintain any PII and PHI they communicated to it as confidential.

7.    Plaintiffs and Class Members were unaware that their PII and PHI were being surreptitiously transmitted to Facebook as they communicated with their healthcare provider.

8.    Indeed, Defendant has only now just started notifying Plaintiffs and Class Members about the disclosure of their PII and PHI to Facebook, meaning their information has been in the possession of and utilized by Facebook for possibly years before Defendant warned them. The number of patients affected by Defendant's unlawful practices is over 1,300,000.

9.    Defendant admits that it disclosed Plaintiffs and Class Members' PII and PHI, including, but not limited to, demographic information such as email address, phone number, computer IP address, and contact information entered into Emergency Contacts or Advanced Care Planning; and information such as appointment type and date, physician selected, button/menu selections, and/or content typed into free text boxes. [9]

---

[7] https://developers.facebook.com/docs/meta-pixel/
[8] *See supra* Fn. 1.
[9] https://www.novanthealth.org/home/about-us/newsroom/press-releases/newsid33987/2672/novant-health-notifies-patients-of-potential-data-privacy-incident-

10.     By obtaining, collecting, using, and deriving a benefit from the PII and PHI of Plaintiffs and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized use or disclosure and to maintain it as confidential.

11.     Plaintiffs bring this action on behalf of all persons whose PII and PHI were compromised as a result of Defendant's failure to: (i) adequately restrict the disclosure of the PII and PHI of Plaintiffs and Class Members; (ii) obtain the consent of Plaintiffs and Class Members to disclose their PII and PHI to Facebook or others; (iii) to prevent the use of Plaitffs' and Class Members PII and PHI by third parties for marketing purposes; and (iv) to design their patient facing website to maintain the confidentiality and integrity of patient PII and PHI. Defendant's conduct was willful and intentional and violates federal and state statutes.

12.     Plaintiffs and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: financial losses related to the payments or services made to Defendant that Plaintiffs and Class Members would not have made had they known of Defendant's disclosure of their PII and PHI to Facebook; lost control over the value of their PII and PHI; invasion of their privacy interests, and other harm resulting from the unauthorized use or threat of unauthorized use of their PII and PHI, including for unwanted solicitations or marketing directed at them as a result of the conduct complained of herein.

13.     Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, and/or negligently failing to disclose that their PII and PHI would be disclosed to a third party, failing to properly design their website such that Plaintiffs' and Class Members' PII and PHI was maintained as confidential, and failing to take available steps to prevent

---

.aspx (last visited August 21, 2022).

an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies and procedures regarding the sharing of PII and PHI. As the result, the PII and PHI of Plaintiffs and Class Members was compromised through disclosure to an unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains confidential, and they should be entitled to injunctive and other equitable relief.

14. Moreover, Defendant's negligence has affected over one million Class Members all across the country. Indeed, according to its report submitted the United States Department of Health and Human Services, Defendant admits that the PII and PHI of at least 1,362,296 individuals were disclosed to Facebook without their knowledge or consent. [10]

## PARTIES

15. Plaintiff, Kevin Curry, is a natural person and citizen of North Carolina, residing in Waxhaw, North Carolina, where he intends to remain. According to a notice he received from Defendant, Mr. Curry's PII and PHI were disclosed to Facebook without his knowledge or consent.

16. Plaintiff, Christine Curry, is a natural person and citizen of North Carolina, residing in Waxhaw, North Carolina, where she intends to remain. According to a notice she received from Defendant, Ms. Curry's PII and PHI were disclosed to Facebook without her knowledge or consent.

17. Defendant, Novant Health, Inc., is a North Carolina company with its principal place of business at 2085 Frontis Plaza Blvd., Winston-Salem, North Carolina 27103.

## JURISDICTION & VENUE

18. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of

---

[10] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited: Aug. 22, 2022).

$5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, is a citizen of a state different from Defendant.

19.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

20.     Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

**FACTUAL ALLEGATION**

***Defendant Disclosed Plaintiffs' and Class Members' Private Information***

21.     In May 2020, Defendant launched a campaign to connect Plaintiffs and Class Members to Defendant's digital healthcare platform, with the goal of improving access to care through virtual visits and provide increased accessibility. [11]

22.     Defendant's utilized Facebook advertisements and a Facebook tracking pixel placed on Defendant's website to assist Defendant with its goal of encouraging adoption of its online healthcare platform. [12] A tracking pixel is a piece of code that organization commonly use to measure activity and experiences on their website. [13]

23.     Through seeking Defendant's services as a medical provider, Plaintiffs and Class Members unknowingly submitted their PII and PHI to Facebook via the Facebook Pixel that Defendant placed on its website.

24.     Specifically, through Defendant's website, Plaintiffs and Class Members communicated PII and PHI that they did not intend or have any reason to suspect would be shared

---

[11] *See supra* Fn. 2.
[12] *Id*.
[13] *Id*.

with Facebook.

25.     Defendant did not disclose to Plaintiffs or Class Members that Defendant used Plaintiffs' and Class Members' website submissions for Facebook's marketing purposes.

26.     Defendant tracked Plaintiffs' and Class Members' Private Information via the tracking pixel from May 2020 to June 17, 2022.

27.     Plaintiffs and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their PII and PHI.

28.     By law, Plaintiffs are entitled to privacy in their protected health information and confidential communications. Defendant deprived Plaintiffs of their privacy rights when it: (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiffs' and other online patients' confidential communications and Private Information; (2) disclosed patients' protected information to Facebook—an unauthorized third-party; and (3) undertook this pattern of conduct without notifying Plaintiffs' or the Class and without obtaining their express written consent.

***Facebook's Platform and its Business Tools***

29.     Facebook describes itself as a "real identity platform,"[14] meaning users are allowed only one account and must share "the name they go by in everyday life."[15]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[16]

30.     In 2021, Facebook generated $117 billion in revenue.[17]  Roughly 97% of that came

---

[14] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[15] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[16] FACEBOOK, SIGN UP, https://www.facebook.com/

[17] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS,

from selling advertising space.[18]

31. Facebook sells advertising space by highlighting its ability to target users.[19] Facebook can target users so effectively because it surveils user activity both on and off its site.[20] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[21] Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[22]

32. Advertisers can also build "Custom Audiences."[23] Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[24] With Custom Audiences, advertisers can target existing customers directly, and they can also build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[25] Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply

---

https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

[18] *Id.*

[19] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[20] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[21] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[22] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[23] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[24] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[25] Facebook, About Lookalike Audiences, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

8

Facebook with the underlying data. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[26]

33.     As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[27]  Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

34.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[28]  Facebook's Business Tools can also track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[29]  Advertisers can even create their own tracking parameters by building a "custom event."[30]

[26] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494; Facebook,
Create a Website Custom Audience,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.
[27] FACEBOOK, THE FACEBOOK BUSINESS TOOLS,
https://www.facebook.com/help/331509497253087.
[28] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED,
https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST
PRACTICES FOR FACEBOOK PIXEL SETUP,
https://www.facebook.com/business/help/218844828315224?id=1205376682832142;
FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-
api/.
[29] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[30] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142; see also
FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-
api/.

9

35.     One such Business Tool is the Facebook Tracking Pixel.  Facebook offers this piece of code to advertisers, like Defendant, to integrate into their website.  As the name implies, the Facebook Pixel "tracks the people and type of actions they take."[31]  When a user accesses a website hosting the Facebook Pixel, Facebook's software script surreptitiously directs the user's browser to send a separate message to Facebook's servers.  This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Facebook Pixel is configured to collect.  This transmission is initiated by Facebook code and concurrent with the communications with the host website.  Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's websites—Defendant's own code, and Facebook's embedded code.

36.     An example illustrates the point.  Take an individual who navigates to Defendant's website and clicks on a tab for "Women's Health."  When that tab is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.  Because Novant utilizes the Facebook Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening.  Facebook causes the browser to secretly duplicate the communication with Novant, transmitting it to Facebook's servers, alongside additional information that transcribes the communication's content and the individual's identity. If the patient then clicks on the "Conditions and treatments" tab and then again clicks on the "Domestic violence" tab, this information is sent to Facebook along with personally identifiable information like the patient's IP address or device ID or other the information they input into Novant's website, like their home address or phone number. This is precisely the type of information that HIPAA

---

[31] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

requires healthcare providers to de-anonymize to protect the privacy of patients.[32]

37. The Facebook Pixel also transmits information that patients type into search boxes, e.g., "do I have covid" or forms that request confidential information like patient contact information, medical histories, insurance and financial information, and Social Security numbers.[33]

38. After intercepting and collecting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. If the website visitor is also a Facebook user, Facebook will associate the information that it collects from the visitor with a Facebook ID that identifies their name and Facebook profile, i.e., their real world identity.

***Defendant's Privacy Policy***[34]

39. Defendant publishes several privacy policies that represent to patients and visitors to its website that Novant will keep sensitive information confidential and that they will only disclose PII and PHI provided to it under certain circumstances, none of which apply here.

40. Defendant publishes a Patient Bill of Rights which tells patients that they have the right to "personal privacy" and "[p]rivacy, confidentiality and access to your medical information." Defendant also requires that patients "[s]hare as much information with us as possible about your health [and] medications."[35]

41. Defendant's separately published Notice of Privacy Practices[36] assures patients that, "[w]e must protect the privacy of health information about you that can identify you."

---

[32] https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html
[33] *See e.g.*, Press releases | Novant Health
[34] https://www.novanthealth.org/Portals/92/Assets/Documents/Corporate/PDFs/Novant%20Health%20Notice%20of%20Privacy%20Policies%20for%20North%20Carolina.pdf (last visited: August 22, 2022).
[35] Patient Bill of Rights | Novant Health
[36] *Id.*

11

42.     The Notice of Privacy Practices explains Defendant's legal duties with respect to Private Information and the exceptions for when Defendant can lawfully use and disclose Plaintiffs' and Class Members' Private Information in the following ways:

- To provide healthcare treatment to you;

- To obtain payment for services;

- For healthcare operations;

- To raise money for our organization;

- To remind you about appointments;

- To tell you about treatment options;

- To our business associates;

- When it is required by law;

- For public health activities;

- For health oversight activities;

- For a legal proceeding;

- For law enforcement purposes;

- To a medical examiner or funeral director;

- For organ, eye, or tissue donation purposes;

- For medical research;

- To avoid a serious threat to health or safety;

- For specialized government functions; and

- For law enforcement custodial situations.

43.     Defendant's privacy policy does not permit Defendant to use and disclose Plaintiffs' and Class Members' Private Information for marketing purposes. Defendant further

promises patients that "In any situation other than those listed above, we may ask for your written authorization before we use or disclose your PHI."

44.     Defendant also publishes a Patient Privacy HIPAA notice that specifically represents:

> we can only release your personal health information to those directly involved in providing your care; however, you have the right to grant access to your personal medical or billing information to other individuals or organizations of your choice. If you choose to do so, we require a written authorization.[37]

45.     Defendant violated its own privacy policy by unlawfully disclosing Plaintiffs' and Class Members' Private Information to Facebook, Meta, and third parties without adequately disclosing that it shared PHI and PII with third parties and without acquiring the specific patients' consent or authorization to share the PII and PHI.

*Plaintiff Kevin Curry's Experiences*

46.     Plaintiff Kevin Curry entrusted his PII and PHI to Defendant as a condition of receiving Defendant's services.

47.     Plaintiff Kevin Curry accessed Defendant's website to receive healthcare services from Defendant and at Defendant's direction. Plaintiff Kevin Curry reasonably expected that his communications with Novant via the website were confidential, solely between himself and Novant, and that such communications would not be transmitted to or intercepted by a third party.

48.     Plaintiff provided his Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

49.     As described herein, Novant assisted Facebook with intercepting Plaintiff Kevin

---

[37] https://www.novanthealth.org/home/patients--visitors/patient-bill-of-rights/patient-privacy-hipaa.aspx

Curry's communications, including those that contained personally identifiable information, protected health information, and related confidential information. Novant facilitated these interceptions without Plaintiff Kevin Curry's knowledge, consent, or express written authorization.

50.     Defendant transmitted to Facebook Plaintiff's email address, phone number, computer IP address, and contact information entered into Emergency Contacts or Advanced Care Planning; and information such as appointment type and date, physician selected, button/menu selections, and/or content typed into free text boxes

51.     By failing to receive the requisite consent, Novant breached confidentiality and unlawfully disclosed Plaintiff Kevin Curry's personally identifiable information and protected health information.

52.     Defendant did not inform Plaintiff Kevin Curry that it had shared his PII and PHI with Facebook until on or around August 12, 2022.

53.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of Plaintiff's Private Information—a form of intangible property that Plaintiff Kevin Curry entrusted to Defendant, which was compromised in and as a result of Defendant's willful and intentional acts. Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result and has anxiety and increased concerns for the loss of his privacy.

54.     Plaintiff Kevin Curry has a continuing interest in ensuring that Plaintiff's PII and PHI, which, upon information and belief, remain backed up in Defendant's possession, is protected, and safeguarded from future unauthorized disclosure.

***Plaintiff Christine Curry's Experiences***

55.     Plaintiff Christine Curry entrusted her PII and PHI to Defendant as a condition of

receiving Defendant's services.

56.     Plaintiff Christine Curry accessed Defendant's website to receive healthcare services from Defendant and at Defendant's direction. Plaintiff Christine Curry reasonably expected that her communications with Novant via the website were confidential, solely between herself and Novant, and that such communications would not be transmitted to or intercepted by a third party.

57.     Plaintiff provided her Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

58.     As described herein, Novant assisted Facebook with intercepting Plaintiff Christine Curry's communications, including those that contained personally identifiable information, protected health information, and related confidential information. Novant facilitated these interceptions without Plaintiff Christine Curry's knowledge, consent, or express written authorization.

59.     Defendant transmitted to Facebook Plaintiff's email address, phone number, computer IP address, and contact information entered into Emergency Contacts or Advanced Care Planning; and information such as appointment type and date, physician selected, button/menu selections, and/or content typed into free text boxes

60.     By failing to receive the requisite consent, Novant breached confidentiality and unlawfully disclosed Plaintiff Christine Curry's personally identifiable information and protected health information.

61.     Defendant did not inform Plaintiff Christine Curry that it had shared her PII and PHI with Facebook until on or around August 12, 2022.

62.     Plaintiff suffered actual injury in the form of damages to and diminution in the

15

value of Plaintiff's Private Information—a form of intangible property that Plaintiff Christine Curry entrusted to Defendant, which was compromised in and as a result of Defendant's willful and intentional acts. Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result and has anxiety and increased concerns for the loss of her privacy.

63. Plaintiff Christine Curry has a continuing interest in ensuring that Plaintiff's PII and PHI, which, upon information and belief, remain backed up in Defendant's possession, is protected, and safeguarded from future unauthorized disclosure.

## CLASS ACTION ALLEGATIONS

64. Plaintiffs brings this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class") on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

65. The Nationwide Class that Plaintiffs seeks to represent is defined as follows:

All individuals residing in the United States whose PHI and PII was disclosed to a third party without authorization or consent, including all persons receiving notice about such disclosures from Defendant.

66. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

67. Plaintiffs reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

68. Numerosity, Fed R. Civ. P. 23(a)(1): The Nationwide Class members are so numerous that joinder of all members is impracticable. Upon information and belief, there are over

16

one million individuals whose PII and PHI may have been improperly accessed by Facebook, and the Class is identifiable within Defendant's records.

69. <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the PII and PHI of Plaintiffs and Class Members;

b. Whether Defendant had duties not to disclose the PII and PHI of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendant violated its privacy policy by disclosing the PII and PHI of Plaintiffs and Class Members to Facebook, Meta, and/or additional third parties.

d. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII and PHI would be disclosed to third parties;

e. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their PII and PHI had been compromised;

f. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient PHI and PII;

g. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII and PHI of Plaintiffs and Class Members;

h. Whether Defendant violated the consumer protection statutes invoked herein;

i. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j. Whether Defendant knowingly made false representations as to it data security and

17

/or privacy policy practices;

k. Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy policy practices; and

l. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their PII and PHI.

70. <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class Members because all had their PII and PHI compromised as a result of Defendant's incorporation of the Facebook Pixel, due to Defendant's misfeasance.

71. <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs has suffered are typical of other Class Members. Plaintiffs has also retained counsel experienced in complex class action litigation, and Plaintiffs intends to prosecute this action vigorously.

72. <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class

18

Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

73. <u>Policies Generally Applicable to the Class</u>, This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

74. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

75. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting

this lawsuit as a class action.

76.     Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

77.     Unless a Class-wide injunction is issued, Defendant may continue in their failure to properly secure the PII and PHI of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

78.     Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

79.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

  a.  Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' PII and PHI;

  b.  Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' PII and PHI with respect to Defendant's privacy policy;

  c.  Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII and PHI;

  d.  Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

20

e. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their PHI and PII would be disclosed to third parties;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

g. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

80. Plaintiffs reserve the right to amend or modify the Class definition as this case progresses.

81. <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Class consists of approximately 1,300,000 Class Members whose sensitive data was compromised by Defendant.

82. <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' PHI and PII;

b. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' PII and PHI;

c. Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct; and;

> d.   Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

83.   <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII and PHI, like that of every other Class Member, was compromised by Defendant's disclosure.

84.   <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

85.   <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

86.   <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each

Class Member.

## COUNT I
### Invasion of Privacy
### (On Behalf of Plaintiffs and the Putative Rule 23 Class)

87. Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

88. Plaintiffs and Class Members had a legitimate expectation of privacy regarding their PII and PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

89. Defendant owed a duty to Plaintiffs and Class Member to keep their PII and PHI confidential.

90. The unauthorized disclosure and/or acquisition by a third party of Plaintiffs' and Class Members' PII and PHI is highly offensive to a reasonable person.

91. Defendant's willful and intentional disclosure of Plaintiffs' and Class Members' PII and PHI constitutes an intentional interference with Plaintiffs' and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

92. Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiffs' and Class Members privacy because Defendant facilitated Facebook's simultaneous eavesdropping and wiretapping of confidential communications.

93. Defendant's failure to protect Plaintiffs' and Class Members' Private Information acted with a knowing state of mind when it incorporated the Facebook Pixel into its wesbite because it knew the functionality and purpose of the Facebook Pixel.

94. Because Defendant intentionally and willfully incorporated the Facebook Pixel into

23

its website and encouraged patients to use that website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiffs and Class Members.

95.     As a proximate result of Defendant's acts and omissions, the private and sensitive PII and PHI of Plaintiffs and the Class Members was disclosed to a third party without authorization, causing Plaintiffs and the Class to suffer damages.

96.     Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII and PHI are still maintained by Defendant and still in the possession of Facebook and the wrongful disclosure of the information cannot be undone.

97.     Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Facebook who on information and belief continues to possess and utilize that information.

98.     Plaintiffs, on behalf of themselves and Class Members, seek injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' PII and PHI and to adhere to its statutory, common law, and contractual duties.

99.     Plaintiffs, on behalf of themselves and Class Members, seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, punitive damages, plus prejudgment interest, and costs.

**COUNT II**
**Violation of North Carolina's Unfair and Deceptive Trade Practice Act**
**N.C. Gen. Stat. § 75-1.1, *et seq*.**
**(On behalf of Plaintiffs and the Putative Class)**

100.     Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

101.     N.C. Gen. Stat. § 75-1.1. (the "NC UDTPA") declares unlawful "unfair methods

24

of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

102.    Defendant's conduct was in and affecting commerce and constitutes an unfair or deceptive trade practice under the NC UDPTA.

103.    Specifically, Defendant's unlawful disclosure of Plaintiffs' and Class Members' PII and PHI constitutes a per se violation of NC UDPTA.

104.    Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment and omission of material facts in connection with the sale and advertisement of their services in violation of the NC UDPTA: (i) unlawfully disclosing Plaintiffs' and Class Members' Private Information to Facebook, Meta, and third parties; (ii) failing to disclose or omitting material facts to Plaintiffs and Class Members regarding the disclosure of their Private Information to Facebook, Meta, and third parties; and (iii) failing to take proper action to ensure the proper pixel was configured to prevent unlawful disclosure of Plaintiffs' and Class Members' Private Information.

105.    Defendant's actions also constitute deceptive and unfair acts or practices because Defendant knew it failed to disclose to Plaintiffs and Class Members that their healthcare related communications via the website would be disclosed to Facebook, Meta, and third parties.

106.    Defendant's actions also constitute deceptive and unfair acts or practices because Defendant intended that Plaintiffs and Class Members rely on its deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendant's offering of goods and services. Namely, Defendant knew that Plaintiffs and Class Memebers depended and relied upon it to keep their communications confidential and Defendant instead disclosed that information to Facebook.

107.    In addition, Defendant's material failure to disclose that Defendant collects Plaintiffs' and Class Members' Private Information for marketing purposes with Facebook constitutes an unfair act or practice prohibited by the NC UDPTA. Defendant's actions were immoral, unethical, and unscrupulous.

108.    Plaintiffs have reasonable expectations of privacy in his communications exchange with Defendants, including communications exchanged at www.novanthealth.org and on the log-in page for MyChart Portal.

109.    Plaintiff's reasonable expectations of privacy in the communications exchanged with Defendant were further buttressed by Defendant's express promises in its Notice of Privacy Practices, Patient Bill of Rights and HIPAA Privacy notice.

110.    Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant deployed pixel code to disclose and transmit Plaintiff's personally identifiable, non-public medical information, and the contents of their communications exchanged with Defendant to third parties, i.e., Facebook and Meta.

111.    Defendant's disclosures of Plaintiffs' and Class Members' Private Information were made without their knowledge, consent, or authorization, and were unprivileged.

112.    The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

113.    Defendant willfully, knowingly, intentionally, and voluntarily engaged in the aforementioned acts when it incorporated the Facebook Pixel with knowledge of the Pixel's purpose and functionality.

114.    The harm described herein could not have been avoided by Plaintiffs and Class Members through the exercise of ordinary diligence.

26

115.    As a result of Defendant's wrongful conduct, Plaintiffs were injured in that they never would have provided their PII and PHI to Defendant, or purchased Defendant's services, had they known or been told that Defendant shared their confidential and sensitive PII and PHI with Facebook.

116.    As a direct and proximate result of Defendant's violations of the NC UDPTA, Plaintiffs and Class Member have suffered harm, including financial losses related to the payments or services made to Defendant that Plaintiffs and Class Members would not have made had they known of Defendant's disclosure of their PII and PHI to Facebook; lost control over the value of their PII and PHI; and other harm resulting from the unauthorized use or threat of unauthorized use of their PII and PHI, including for unwanted solicitations or marketing, entitling them to damages in an amount to be proven at trial.

117.    Pursuant to N.C. Gen. Stat. § 75-16, § 75.16.1, Plaintiffs request damages, treble damages, punitive damages, and attorneys' fees in addition to all other relief allowed by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

A.    For an Order certifying the Nationwide Class and appointing Plaintiffs and thier Counsel to represent each such Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII and PHI of Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and

Class Members:

D.        For an award of damages, including, but not limited to, actual, consequential, punitive, and nominal damages, as allowed by law in an amount to be determined;

E.        For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.        For prejudgment interest on all amounts awarded; and

G.        Such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand that this matter be tried before a jury.

DATE: August 23, 2022                  Respectfully Submitted,

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**

*/s/ Scott C. Harris*
Scott C. Harris
N.C. Bar No: 35328
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5003
Facsimile: (919) 600-5035
sharris@milberg.com

David K. Lietz*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
5335 Wisconsin Avenue NW
Suite 440
Washington, D.C. 20015-2052
Telephone: (866) 252-0878
Facsimile: (202) 686-2877
dlietz@milberg.com

28

Gary M. Klinger*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866.252.0878
gklinger@milberg.com

Bryan L. Bleichner*
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401
Phone: (612) 339-7300
Fax: (612) 336-2940
*bbleichner@chestnutcambronne.com*

* *Pro hac vice forthcoming*

***Counsel for Plaintiffs and the Class***